**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ivan Lamont SLEET, Defendant–**
**Appellant.**

No. 94–2244.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 6, 1995.

Decided April 24, 1995.

Susan H. Dowd, Asst. U.S. Atty. (argued), Indianapolis, IN, for U.S.

Patrick Stern (argued), Indianapolis, IN, for Ivan Lamont Sleet.

Before MANION and ROVNER, Circuit Judges, and NORGLE, District Judge.[*]

ROVNER, Circuit Judge.

Ivan Lamont Sleet was convicted by a jury of two counts of armed bank robbery (18 U.S.C. § 2113(a) & (d)) and two counts of using a firearm during the commission of a crime of violence (18 U.S.C. § 924(c)). These convictions relate to two separate bank robberies—the first, of First Indiana Bank on August 27, 1993, and the second, of Union Federal Savings Bank on September 23, 1993. In this appeal, Sleet maintains that the district court committed a number of errors that allegedly entitle him to a reversal of those convictions and to a new trial. Finding no such error, we affirm Sleet's convictions.

## I.

Sleet first contends that the district court erred in denying his motion to suppress evidence recovered by FBI agents in searching his apartment after the second robbery. The agents discovered in the course of their search a gun and a pair of black gloves that matched the description of the gloves worn by the perpetrator of the First Indiana robbery. The search was conducted under the auspices of a warrant issued by a federal magistrate after Sleet had been arrested for the Union Federal robbery. FBI Special Agent Jack L. Osborne submitted an affidavit in support of the search warrant application in which he stated that the First Indiana robber had been described by witnesses as an African–American male in his mid-20s who was approximately 5′6″ tall and weighed 140 pounds. The robber had been wearing a red hooded sweatshirt, white pants, white tennis shoes, a ski mask, and gloves, and he had been brandishing a large handgun. Osborne explained that, according to witnesses, the robber had vaulted the bank's counter, pointed his gun at bank employees, taken money from two teller positions, and placed the money in a dark gym bag. Witnesses

also said that the robber then revaulted the counter and ran toward the Firethorn apartment complex, which is located approximately one block north of the First Indiana Bank. Sleet told Osborne after his arrest that he lived in the Firethorn complex, which Osborne then confirmed with the manager of the complex. The manager told Osborne that Sleet had been the sole leaseholder of an apartment in the Firethorn complex since July 1993 and that he had paid his September rent with a money order only one or two days after the First Indiana robbery. Osborne explained in his affidavit that Sleet matched the description provided by witnesses to the robbery and also that employees of two businesses adjacent to the bank had seen an African–American male wearing a red hooded sweatshirt and white tennis shoes in the area of the bank on the day before the robbery.

Based on Osborne's affidavit and the criminal complaint that issued against Sleet for the Union Federal robbery, the magistrate issued a warrant for the search of Sleet's apartment, authorizing agents to search for "United States currency, guns, clothing, gym bags, ski masks, shoes and other evidence which constitutes fruits and instrumentalities of bank robberies." Among the items seized from the apartment were a Taurus 9 mm semi-automatic pistol and a pair of black winter gloves. Sleet moved to suppress this evidence prior to his trial, contending that the search warrant was not supported by probable cause. The district court denied the motion, finding that

[i]n light of the circumstances surrounding Sleet's apprehension in connection with the Union Federal robbery, the similarities between the Union Federal robbery and the First Indiana robbery, the evidence that the First Indiana robber fled toward the Firethorn complex, and the evidence that Sleet lived alone in the Firethorn complex at the time of the First Indiana robbery, a reasonable person could believe that Sleet performed both the Union Federal robbery and the First Indiana robbery, and that after the First Indiana robbery Sleet fled to his apartment at the Firethorn complex.

[*] The Hon. Charles R. Norgle, Sr., of the Northern District of Illinois, sitting by designation.

(R. 17, at 6–7.) In short, the district court determined that the magistrate had probable cause to authorize a search of Sleet's apartment.

We review probable cause determinations in warrant cases for clear error. *United States v. Pless,* 982 F.2d 1118, 1124 (7th Cir.1992); *United States v. Spears,* 965 F.2d 262, 269 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992). We will reverse a refusal to suppress evidence seized pursuant to a search warrant only if, upon reviewing all of the evidence, "we are 'left with the definite and firm conviction that a mistake has been made.' " *United States v. James,* 40 F.3d 850, 874 (7th Cir.1994) (quoting *United States v. Tilmon,* 19 F.3d 1221, 1224 (7th Cir.1994)), *cert. denied,* —— U.S. ——, ——, 115 S.Ct. 948, 1160 (1995). In that regard, "doubtful cases are to be resolved in favor of upholding the warrant." *Pless,* 982 F.2d at 1124; *see also Illinois v. Gates,* 462 U.S. 213, 237, 103 S.Ct. 2317, 2331 n. 10, 76 L.Ed.2d 527 n. 10 (1983).

The Supreme Court explained in *Illinois v. Gates* that

> [t]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

462 U.S. at 238, 103 S.Ct. at 2332; *see also Pless,* 982 F.2d at 1124; *United States v. Lamon,* 930 F.2d 1183, 1187 (7th Cir.1991). "The critical element in a reasonable search," the Supreme Court has said, "is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily,* 436 U.S. 547, 556, 98 S.Ct. 1970, 1977, 56 L.Ed.2d 525 (1978); *see also United States v. Malin,* 908 F.2d 163, 165 (7th Cir.), *cert. denied,* 498 U.S. 991, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990).

Sleet maintains that a search warrant should not have issued here because there was an insufficient nexus between the First Indiana robbery and his apartment. Because he was apprehended after the Union Federal robbery at a different apartment complex, Sleet contends that there is nothing to link either of the robberies to his Firethorn apartment. He relies in this regard on *United States v. Dickerson,* 975 F.2d 1245, 1249–50 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1316, 122 L.Ed.2d 703 (1993), where we found it unlikely that an affidavit which established probable cause to search a bank robber's automobile also provided probable cause to search his home. The only evidence in that case linking the automobile used in the robbery to the defendant's residence was the vehicle's registration, and we believed that this was insufficient to support a search of the residence. *Id.* at 1250. Yet in contrast to *Dickerson,* circumstantial evidence exists in the present case that links the First Indiana robbery to Sleet's apartment, providing probable cause to search for items used or obtained in that robbery at the Firethorn location.

Our cases explain that a search warrant may issue "even in the absence of '[d]irect evidence linking criminal objects to a particular site.' " *Lamon,* 930 F.2d at 1188 (quoting *United States v. Jackson,* 756 F.2d 703, 705 (9th Cir.1985)); *see also Malin,* 908 F.2d at 165. The magistrate to whom the warrant application is directed "is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense," and the magistrate "need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." *Malin,* 908 F.2d at 166 (internal quotations omitted); *see also Lamon,* 930 F.2d at 1188. The magistrate's conclusion here, that it would be reasonable to search for the fruits and instrumentalities of the First Indiana robbery in Sleet's apartment, was supported by the evidence outlined in Osborne's affidavit. First, Sleet had been arrested and charged with the Union Federal robbery, which had been carried out in a manner similar to the earlier robbery of First Indiana Bank. Moreover, the fact that

the First Indiana bank is located less than half a mile from Sleet's apartment, that Sleet is the sole occupant of that apartment, and that several witnesses saw the First Indiana robber fleeing in the direction of the Firethorn complex makes it reasonable to seek items relating to that robbery in Sleet's apartment. *Cf. Lamon,* 930 F.2d at 1188–90 (evidence of drug dealing is likely to be found where the drug dealer lives); *Malin,* 908 F.2d at 166 (officer's report of marijuana growing in the defendant's backyard provided probable cause to support warrant for a search of his residence). The magistrate thus had a "substantial basis" for concluding that there was probable cause to search Sleet's apartment. *See Gates,* 462 U.S. at 238–39, 103 S.Ct. at 2332–33.

Yet even if the warrant was unsupported by probable cause, suppression of the pistol and gloves would not be required here. In *United States v. Leon,* 468 U.S. 897, 926, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984), the Supreme Court held that evidence recovered during the execution of a facially-valid search warrant that is later invalidated by the courts is not always subject to suppression:

> In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.

*See Pless,* 982 F.2d at 1126; *Lamon,* 930 F.2d at 1189; *see also Arizona v. Evans,* —— U.S. ——, —— – ——, 131 L.Ed.2d 34, 115 S.Ct. 1185, 1191–92 (1995) (discussing *Leon* ). Here, Sleet does not contend that the magis-

trate abandoned his detached and neutral role or that Agent Osborne was somehow dishonest or reckless in preparing his affidavit. We also have no doubt that Osborne could have harbored an objectively reasonable belief that there was probable cause to support the warrant. *Leon* asks whether "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization" (468 U.S. at 922 n. 23, 104 S.Ct. at 3420 n. 23), and in the ordinary case, a law enforcement officer "cannot be expected to question" the magistrate's probable cause determination. *Illinois v. Krull,* 480 U.S. 340, 349, 107 S.Ct. 1160, 1167, 94 L.Ed.2d 364 (1987). Agent Osborne would have had no reason to question the warrant here because his affidavit pointed to significant circumstantial evidence indicating that Sleet may have been the perpetrator of the First Indiana robbery and that the fruits and instrumentalities of that robbery may be located in his apartment. *See, e.g., Dickerson,* 975 F.2d at 1250; *Pless,* 982 F.2d at 1126. The district court thus did not clearly err in refusing to suppress the pistol and gloves.[1]

### II.

Sleet next contends that the district court erred in not suppressing the identification testimony of Marsha Carr, Deborah Schmitz, and Jeffrey Wagner. Carr and Schmitz both were employed by businesses located near the First Indiana Bank, and both saw a suspicious-looking African–American male in the vicinity of the bank on the day before the robbery. Carr told authorities that the man had been outside her building for approximately twenty minutes, that he appeared to be in his mid-twenties, that he was approxi-

---

1. Sleet also contends that the search warrant was overly broad in that it failed to describe with sufficient particularity the items to be seized. We agree with the government, however, that Sleet waived this argument by failing to raise it before the district court. *See United States v. Barnes,* 909 F.2d 1059, 1068 (7th Cir.1990). We thus review the argument only for plain error. *United States v. South,* 28 F.3d 619, 625 (7th Cir.1994).

"Although the fourth amendment requires that a search warrant describe the objects of·the search with reasonable specificity, it need not be

elaborately detailed." *United States v. Somers,* 950 F.2d 1279, 1285 (7th Cir.1991), *cert. denied,* 504 U.S. 917,·112 S.Ct. 1959, 118 L.Ed.2d 561 (1992); *see also United States v. Shoffner,* 826 F.2d 619, 630 (7th Cir.), *cert. denied,* 484 U.S. 958, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987). The level of specificity must be such, however, that the officers executing the warrant are "able to identify the things to be seized with reasonable certainty." *Spears,* 965 F.2d at 277. The search warrant here meets that test and does not permit a general rummaging through Sleet's belongings. There was no plain error.

mately 5′7″ tall with a thin to medium build, and that he was wearing a red hooded sweatshirt with the hood up, although the temperature had been over ninety degrees. On September 3, 1993, Agent Osborne showed Carr a photo array that included the photographs of six African–American males (but not a photograph of Sleet) and asked if the man she had seen outside the bank on August 26 was one of the men pictured. Carr was certain that the man she had seen was not among the men in the photographs. Two months later, on November 2, 1993, Osborne showed Carr a photo spread that did include Sleet's picture, and although Carr expressed some uncertainty about the nose and lips, she identified Sleet's photograph as depicting the man she had seen outside the bank. Carr indicated to Osborne at the time, however, that she would be more comfortable with a physical line-up than with the photo display.

Schmitz, meanwhile, was a nurse who worked in the building directly east of First Indiana Bank. Early on the morning of August 26, 1993, as she was pulling into the parking lot of her building, Schmitz saw an African–American male traversing the lot. She described the man as being approximately 5′7″ or 5′8″ tall with a slight build. Schmitz thought the man was in his mid-twenties. He was wearing a red hooded sweatshirt with the hood up, a baseball cap, light colored sweatpants, and white tennis shoes with black laces. Schmitz' attention was drawn to the man because he was wearing heavy clothing on a very hot day and because Schmitz was frightened of being the only individual at her office at that hour of the morning. Agent Osborne subsequently showed Schmitz a six person photo array on September 3, 1993, which did not include a photograph of Sleet. Schmitz told Osborne that none of the photographs depicted the man she had seen in the parking lot on August 26. Schmitz was shown a second photo array on November 2, and this time, she identified Sleet as the man she had seen in the parking lot on the day before the First Indiana robbery.

The identification testimony of Jeffrey Wagner, on the other hand, related to the September 23, 1993 robbery of Union Federal Savings Bank. Wagner was in his pickup truck in the parking lot of the supermarket where Union Federal is located when an African–American male wearing a black ski mask, a gray hooded sweatshirt, and white tennis shoes with black bottoms ran in front of him. People were chasing the man across the parking lot, and Wagner immediately dialed 911 on his mobile telephone and then joined the chase in his truck. The man crossed the street and ran toward the Lake Castleton apartment complex, and Wagner followed him. As the man ran between the apartment buildings in the complex, Wagner was able to catch occasional glimpses of him. The first two to three times that Wagner saw the man between the buildings, he was wearing the same sweatshirt and black pants that Wagner had seen in the parking lot, but he was no longer wearing the ski mask. After a time, however, Wagner saw the same man wearing neon blue sweatpants and a black t-shirt, but the same white tennis shoes with black bottoms.[2] Wagner clearly saw the man's face at various points in the chase, and he last saw the man near a laundromat in the apartment complex. After the man moved behind the laundromat, Wagner saw a police car and flagged the officer down. He told the officer that he last glimpsed the man behind the laundromat, and then, so as not to interfere, he returned to the supermarket parking lot. At that point, Wagner described to another officer what he had seen.

Minutes after talking to Wagner in the apartment complex, the first officer found Sleet sitting on the balcony of one of the apartments. Wagner told the officer at the supermarket that he thought he could identify the man he had chased, and he thus agreed to accompany the officer back to the Lake Castleton complex. The officer took Sleet and another witness to the complex, telling them that they could not talk to one another along the way. Wagner viewed Sleet for approximately thirty seconds from a distance of ten to fifteen yards and then

**2.** One of the residents of the Lake Castleton complex found on his patio that afternoon several items that did not belong to him. They includ-

ed a black ski mask, gray hooded sweatshirt, black pants, a revolver, gloves, a multi-colored bag, and United States currency.

identified him as the man he had chased through the apartment complex.

The district court denied Sleet's motion to suppress the identification testimony of all three witnesses, finding that Sleet had failed to establish that either the second photo array shown to Carr and Schmitz or the individual showup for Wagner was unnecessarily suggestive. (R. 19.) We agree that the testimony of these witnesses should not have been suppressed.

▮ In considering the admissibility of challenged identification testimony, we utilize the following two-part test: "The defendant must first establish that the identification procedure was unnecessarily suggestive. If the defendant satisfies this burden, the court considers whether, viewed under the totality of the circumstances, the identification is reliable despite the suggestive procedure." *United States v. Donaldson,* 978 F.2d 381, 385 (7th Cir.1992); *see also Manson v. Brathwaite,* 432 U.S. 98, 107–14, 97 S.Ct. 2243, 2249–53, 53 L.Ed.2d 140 (1977); *Kubat v. Thieret,* 867 F.2d 351, 357 (7th Cir.), *cert. denied,* 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989). "The primary evil to be avoided," according to the Supreme Court, "is a very substantial likelihood of irreparable misidentification." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972); *see also United States v. Clark,* 989 F.2d 1490, 1495 (7th Cir.1993). If a defendant fails to show that a photo display was unnecessarily suggestive, however, we need not consider whether the identification was otherwise reliable. *Donaldson,* 978 F.2d at 387; *United States v. Johnson,* 859 F.2d 1289, 1294 (7th Cir.1988).

▮ The district court found that the second photo array shown to Carr and Schmitz was not unnecessarily suggestive, and the court thus did not consider whether the challenged identifications were otherwise reliable. Although Sleet has continued to press the identification issue in this appeal, he has focused on the reliability of the challenged

testimony and has failed to address how the photo array was in any way suggestive. Indeed, his counsel conceded at oral argument that the second photo array was not in fact suggestive. Our own review of the six photographs used in that array confirms the accuracy of counsel's concession. The six men pictured all are African–American males who look to be approximately the same age. Only the head and neck of each man is visible in the photographs, and each man has short hair and a mustache. The photos reveal nothing about the height or general build of the men. We thus see nothing in the second array that would have caused Carr and Schmitz to identify Sleet's photograph as opposed to one of the other five men. As a result, the district court properly denied Sleet's motion to suppress their identification testimony.[3]

▮ As for Jeffrey Wagner's testimony, Sleet argues that it should have been suppressed because Wagner first identified Sleet only minutes after the Union Federal robbery during an individual showup that was inherently suggestive. A showup " 'occurs when only one suspect is presented to [the] witness.' " *Armstrong v. Young,* 34 F.3d 421, 427 (7th Cir.1994) (quoting *United States v. Clark,* 989 F.2d 1490, 1495 n. 2 (7th Cir.1993)), *cert. denied,* — U.S. —, 115 S.Ct. 1369, 131 L.Ed.2d 224 (1995). A lineup that presents the witness with a choice between suspects is certainly preferable to an individual showup (*see, e.g., Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1973, 18 L.Ed.2d 1199 (1967)), yet our cases "have indicated that 'showups are proper and not unduly suggestive under certain circumstances.' " *Armstrong,* 34 F.3d at 427 (quoting *Clark,* 989 F.2d at 1495). For example, immediate showups may, at times, serve legitimate law-enforcement purposes, as they "allow identification before the suspect has altered his appearance and while the witness' memory is fresh, and permit the quick release of innocent persons." *Johnson v. Dug-*

**3.** Because Sleet has been unable to show that the second photo array was unnecessarily suggestive, we need not proceed to the second step in the analysis. Nonetheless, we are convinced that the identification testimony of both Carr and Schmitz was reliable. Indeed, the reliability of their identifications is evidenced by the fact that neither witness identified any of the photographs in the first array, when Sleet's photograph was not included.

*ger,* 817 F.2d 726, 729 (11th Cir.1987); *see also United States ex rel. Kirby v. Sturges,* 510 F.2d 397, 403 n. 20 (7th Cir.), *cert. denied,* 421 U.S. 1016, 95 S.Ct. 2424, 44 L.Ed.2d 685 (1975). We need not determine whether this showup was unduly suggestive, however, because even if it was, the totality of circumstances convinces us that Wagner's identification was reliable. *See Armstrong,* 34 F.3d at 428; *United States v. Myers,* 892 F.2d 642, 646 (7th Cir.1990) ("Even when the procedure is suggestive . . . the identification may be reliable, and if so the evidence comes in.").

 In that regard, we must consider the following factors: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [the witness'] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson,* 432 U.S. at 114, 97 S.Ct. at 2253; *see also Neil,* 409 U.S. at 198, 93 S.Ct. at 381–82; *Armstrong,* 34 F.3d at 428. Our review of this issue is necessarily limited— we consider only whether the evidence relating to Wagner's identification presents sufficient indicia of reliability that his testimony should have reached the jury despite the possibility of suggestiveness. *Clark,* 989 F.2d at 1495.

 First, the evidence establishes that Wagner had at least five opportunities to view the robber as he chased the man through the Lake Castleton apartment complex. The chase took place in the daylight, and Wagner was able to see the man's face as he ran between the buildings and then stopped outside the laundromat. Wagner also knew what the man was wearing when he first saw him in the parking lot, and he then saw the same man wearing different clothing as he ran between the buildings. Wagner observed that although the man's clothing changed, he was wearing the same white tennis shoes with black bottoms throughout the chase. Wagner's attention

was naturally drawn to the man as soon as he saw him in the parking lot because the man was wearing a ski mask and was being chased. There is thus no question that Wagner had an adequate opportunity to view the robber and that he was unusually attentive to what he saw. *See Armstrong,* 34 F.3d at 428; *Clark,* 989 F.2d at 1495–96.

The remaining three factors also support the reliability of Wagner's identification. Wagner accurately described Sleet's height and weight, as well as what Sleet had been wearing both at the beginning and the end of the chase. He indicated to the officer stationed at the supermarket that he could make a positive identification of the man, and Wagner did not hesitate in identifying Sleet during the showup only minutes after the robbery and the chase. We are thus convinced that there was not a substantial likelihood that Sleet was misidentified even if the showup for Wagner could be characterized as unduly suggestive.

Sleet raises two further issues related to the admission of expert testimony at trial, but when the challenged testimony is read in context, it is clear that the district court did not abuse its discretion in admitting that testimony. *See United States v. Brown,* 7 F.3d 648, 651 (7th Cir.1993).

Having thus rejected all of Sleet's challenges to the conduct of his trial, we affirm his convictions.[4]

AFFIRMED.

---

**4.** Sleet also raised an ineffective assistance of counsel claim in his briefs to this court, but when asked about the claim at oral argument, Sleet's counsel chose to abandon it so that Sleet could reassert the claim in a post-conviction proceeding, where he would have the opportunity to establish a record to support that claim.