UNITED STATES of America,
Plaintiff–Appellee,

v.

Larry F. SINGLETON, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Anthony D. SINGLETON,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Demitress Sanchez COX, Defendant–
Appellant.

Nos. 96–3404, 96–3425, 96–3958.

United States Court of Appeals,
Seventh Circuit.

Argued May 21, 1997.

Decided Sept. 25, 1997.

Robert Lee Garrison (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff–Appellee.

Renee E. Schooley, Lawrence J. Fleming (argued), Office of the Federal Public Defender, East St. Louis, IL, for Larry F. Singleton.

Daniel R. Schattnik, Unsell, Unsell & Schattnik, East Alton, IL, for Anthony D. Singleton.

Robert L. Elovitz (argued), Edwardsville, IL, for Demitress Sanchez Cox.

Before POSNER, Chief Judge, BAUER, and MANION, Circuit Judges.

BAUER, Circuit Judge.

Larry Singleton, Anthony Singleton, and Demitress Cox were convicted of conspiracy to distribute crack cocaine, in violation of 21 U.S.C. § 846, and possession with intent to distribute crack cocaine, in violation of 21 U.S.C. § 841(a)(1). Anthony Singleton and Demitress Cox appeal, contending that the district court erred when it denied their motion to suppress, when it allowed the jury to hear tape recordings made by a confidential informant who was unavailable at trial, when it calculated the amount of drugs attributable to each of them, and when it enhanced each of their sentences for possession of a firearm in connection with their drug distribution. Finding their contentions without merit, we affirm.

On July 18, 1995, Detective Scott Waldrup from the Alton Police Department met with Larry Northcutt, a felon on furlough from jail. Northcutt told Detective Waldrup that he recently had spoken with Anthony Singleton and Cox and that they had agreed to sell him crack cocaine. He stated that he knew both of them, that they had sold him drugs several times in the past, and that he had seen Cox with drugs about a week before. Northcutt explained how he knew the two men; he began buying drugs from Anthony Singleton in late 1993 and continued buying from him through early 1994. Northcutt also stated that he had bought crack cocaine from Larry Singleton, Anthony's uncle, and that Anthony Singleton and Cox were Larry's suppliers.

The police then obtained a petition to eavesdrop and put a hidden recording device on Northcutt. According to Detective Al Adams, on July 21, 1995, police sent Northcutt to purchase two packets of crack cocaine, each containing one-sixteenth of an ounce, from Anthony Singleton or Cox at 2931 Edgewood, where the two men lived. Northcutt met Cox and Anthony Singleton there, but he did not buy any drugs there. He was instead instructed by the two men to go to Larry Singleton's Alton residence and have Larry contact Cox and Anthony Singleton. Northcutt went to Larry Singleton's house and relayed the message to him. Larry did not have a phone in his home, so he told Northcutt to come back in about fifteen minutes. Larry then went to an Alton residence located near the corner of Main and Powhattan Streets to call Anthony and Cox as he had been instructed. Less than five minutes after Larry Singleton entered this residence and made the call, Cox left his house and drove to the intersection of Main and Powhattan. When Cox arrived, Larry got in Cox's car and Cox dropped Larry off at Larry's home. Cox then headed back to his Edgewood residence. Northcutt purchased crack cocaine from Larry Singleton in Larry's backyard. Larry told Northcutt that Anthony Singleton and Cox did not want dealing at the Edgewood residence.[1] North-

---

1. Anthony Singleton and Cox generally directed potential buyers to Larry Singleton. Larry Sin-

gleton often sold crack supplied by Anthony Singleton and Cox out of his own residence. Some-

cutt later turned the cocaine over the Alton police. The two packages tested positive for cocaine.

On two different occasions on July 26, Northcutt set out to buy drugs from Anthony Singleton or Cox at the Edgewood residence, but did not get drugs at that location. On July 27, in addition to Northcutt, police placed a hidden recording device on another confidential informant, John Yarborough. Yarborough was also unsuccessful in his attempt to buy drugs at the Edgewood residence.

On July 28, Northcutt again set out to buy drugs from Anthony Singleton or Cox at the Edgewood residence. Northcutt paged Anthony Singleton. When Anthony returned the page, Northcutt told him that he wanted to buy a couple of "sixteenths." Anthony told Northcutt to go to the Edgewood residence. Alton police tape-recorded this conversation. Once Northcutt met Anthony at his Edgewood home, Anthony told Northcutt to go to Larry's residence and return with him. Northcutt did as he was told and returned to the Edgewood residence with Larry Singleton. Northcutt paid Larry for crack cocaine with $200, which the Alton police had previously photocopied. Police were conducting close surveillance of the Edgewood residence on that day. On Anthony Singleton's front porch, Larry handed Anthony $200, and Anthony handed Larry an unknown item. Detective Al Adams and Northcutt witnessed the exchange. Larry handed Northcutt the drugs as they drove down the block and again explained that Anthony had instructed him not to hand over the crack in front of Anthony's home. Northcutt turned the drugs over to the Alton police.

On July 28, 1995, Detective Al Adams filed a complaint for a search warrant with an accompanying affidavit for the Edgewood residence. The affidavit described Northcutt's cocaine purchases on July 21 and July 28. A magistrate found that probable cause existed and issued the search warrant. A

team of officers executed the warrant on that same day. Inside the Edgewood residence, the police found Anthony Singleton and Cox sitting on top of Anthony's bed near a bag of firearm ammunition. Police recovered crack cocaine, six firearms, and additional ammunition. From Anthony Singleton's pocket, police recovered the $200 which Northcutt had used to buy cocaine from Larry Singleton. Police also recovered over $800 in cash from Cox's pockets. They found pagers and a $543 phone bill for Cox's cellular phone from the preceding month. Anthony Singleton's mother, Mamie Singleton, and her male companion, Paul Ammonette, and eight other people, including Roderick Singleton, Kela Singleton, and Brandon Singleton were all present when the search was executed.

On August 23, 1995, in the Southern District of Illinois, Demitress Cox, Larry Singleton, Anthony Singleton, and Louis Lacey [2] were charged by indictment with conspiracy to distribute and distribution of crack cocaine, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846 (Count I). Counts II and III charged Cox with distribution of crack cocaine, in violation of 21 U.S.C. § 841(a)(1). Counts III and VI charged Anthony Singleton with distribution of crack cocaine, in violation of 21 U.S.C. § 841(a)(1). Counts IV, V, and VI charged Larry Singleton with distribution of crack cocaine, in violation of 21 U.S.C. § 841(a)(1).

On March 4, 1996, Larry Singleton pleaded guilty to all of the counts against him. On July 3, 1996, a jury found Anthony Singleton and Cox guilty on all counts. On September 16, 1996, the district court sentenced Larry Singleton to 210 months on each of Counts I, IV, V, and VI, to be served concurrently. On October 8, 1996, the district court entered an amended order and judgment against Anthony Singleton. The court sentenced him to 360 months imprisonment on Count I and 240 months imprisonment on each of Counts III and VI, all to run concurrently. On November 13, 1996, the district court also sentenced Cox to 360 months imprisonment

---

times, Anthony Singleton and Cox would also sell crack out of Larry Singleton's residence.

2. Louis Lacey later agreed to cooperate with the government and testified against Anthony Singleton and Cox at trial. Lacey is not part of this appeal.

on Count I and 240 months imprisonment on each of Counts III and VI, all to run concurrently.

On appeal, Cox and Anthony Singleton argue that: (1) the district court erred in denying their motion to suppress evidence seized from the search because there was no probable cause to search the Edgewood residence; (2) the district court violated the defendants' right to confront and cross-examine an unavailable confidential informant, John Yarborough, when it permitted the jury to hear tape recordings of the defendants' conversations with Yarborough and when it allowed the jury to have transcripts of any inaudible portions; and (3) the district court made an incorrect determination as to the defendants' relevant conduct and an erroneous finding that the defendants possessed certain firearms. Finally, all three defendants contend that the district court erred when it sentenced them for dealing in cocaine base because the government failed to prove by a preponderance of the evidence that the substance involved was crack cocaine.[3]

## Analysis

### A. *The Motion to Suppress*

On June 24, 1996, Cox and Anthony Singleton filed a motion to suppress evidence seized during the police search of their residence. Following a hearing on the issue, the district court denied their motion. On appeal, Cox and Anthony Singleton argue that there was no probable cause for the warrant because the information contained in the affidavit in support of the warrant did not state that drugs were ever observed at the Edgewood residence. The affidavit also failed to mention that Alton police had attempted to buy drugs at the Edgewood residence on numerous occasions without success. Finally, Anthony Singleton and Cox note that the affidavit failed to mention that there were

certain factors about Northcutt which made him an unreliable informant.

■■■ We review *de novo* the district court's determination that probable cause existed to support a search warrant. *Ornelas v. United States,* —— U.S. ——, —————, 116 S.Ct. 1657, 1662–63, 134 L.Ed.2d 911 (1996); *Hall v. Washington,* 106 F.3d 742, 748 (7th Cir.1997). However, we "review findings of historical fact for clear error" and "give due weight to inferences drawn from those facts by resident judges and local law enforcement officials." *Ornelas,* —— U.S. at ——, 116 S.Ct. at 1663.

■ In issuing a search warrant, a magistrate is given license to draw reasonable inferences concerning where the evidence referred to in the affidavit is likely to be kept, taking into account the nature of the evidence and the offense. *United States v. Sleet,* 54 F.3d 303, 306 (7th Cir.1995). We have found that evidence of drug dealing is likely to be found where the dealers live. *United States v. Lamon,* 930 F.2d 1183, 1188 (7th Cir.1991).

Anthony Singleton and Cox argue that at the time the police applied for the warrant, the only information the police had concerning actual dealing at the Edgewood residence was that Northcutt bought drugs from Anthony Singleton and Cox at that location on unspecified dates. They maintain that this information was "stale" because Northcutt was continuously incarcerated from January 10 through July 17, 1995. But Anthony Singleton and Cox overlook the fact that the purchases which occurred before Northcutt's incarceration did not form the bases for Adams' affidavit. Rather, this information is what prompted police to place a recording device on Northcutt.

■■■ After Northcutt was wired, he bought cocaine in the vicinity of the Edgewood residence on two separate occasions.[4]

---

**3.** At oral argument, counsel for all three defendants conceded that *United States v. Hall,* 109 F.3d 1227, 1235–36 (7th Cir.1997), a case decided after the defendants filed their briefs, resolved this issue against them. We therefore need not discuss this issue on appeal.

**4.** Without citing any authority, Anthony Singleton and Cox argue that the affidavit was insufficient because Detective Adams failed to mention Northcutt's failed attempts and Yarborough's one failed attempt to buy crack cocaine from Cox and Anthony Singleton. But in an affidavit, the police officer must state what items he expects to find at a certain location and why he believes

These two purchases form the basis of Detective Adams' affidavit. Especially telling is Northcutt's July 28, 1995 buy. In his affidavit for the search warrant, Detective Adams noted that Alton police were conducting a surveillance of both the Edgewood residence and Northcutt on July 28, 1995. Detective Adams was keeping close surveillance of the house. He and Northcutt both saw Larry Singleton hand Northcutt's $200 to Anthony and Anthony hand Larry an unknown object on Anthony's front porch. Larry handed Northcutt the drugs as they drove down the block, explaining that Anthony had instructed him not to hand over the crack in front of Anthony's home. Northcutt turned over the cocaine to Alton police. It tested positive for cocaine.

Moreover, the events of July 21, 1995 are revealing. On July 21, 1995, Special Agent Kris Kistner of the Illinois State Police drove Northcutt to meet Cox and Anthony Singleton at their residence. Cox and Anthony instructed Northcutt to go to Larry Singleton's home and have Larry contact them in order to get the crack. Special Agent Kistner drove Northcutt to Larry Singleton's house, and Northcutt relayed the message to Larry Singleton. Larry Singleton did not have a phone in his home, so he told Northcutt to return in about fifteen minutes. Police watched Larry go to an Alton residence located near the corner of Main and Powhattan Streets where he called Anthony and Cox as instructed. At this time, police also were maintaining a constant surveillance of the Edgewood residence. Less than five minutes after Larry Singleton's call, police saw Cox leave his residence. They followed him as he drove directly to the intersection of Main and Powhattan. When Cox arrived, Larry got in the passenger seat of Cox's car and they returned to Larry's residence. After Cox dropped Larry off and headed back to his Edgewood residence, Northcutt bought crack from Larry Singleton in Larry's backyard. From these facts, the magistrate reasonably could have inferred that Cox and Anthony had a crack supply in their residence.

Although neither the police nor Northcutt actually saw drugs inside Anthony and Cox's home, Detective Adams' written statement as to the July 21 and July 28 controlled purchases created a reasonable inference that Anthony Singleton and Cox kept crack in their home. *That* information was not "stale."

The police were justified in thinking that there were drugs at the Edgewood residence. It makes little difference that Northcutt never physically purchased any drugs at the residence. As the district court stated:

> I don't think there is any requirement that before the search warrant can be issued for a residence that an actual sale had taken place within the premises. I think it is sufficient that there be a showing that the headquarters, the base of operations for this organization, is at a particular place, so long as there is evidence substantiating that. I deny the motion to suppress.

The fact that Anthony Singleton and Cox did not want dealing to occur at their home does not make it unreasonable for the police to think that they stashed drugs there, especially in light of Northcutt's July 21 and July 28 buys.

■ Cox and Anthony Singleton also challenge Northcutt's reliability. They point out that the affidavit did not disclose that Northcutt had a criminal history, that he was on disability because of mental retardation, that he was a former mental patient suffering from mental illness, or that he was a "pretty big dealer" in marijuana. They also contend that the affidavit did not demonstrate that Northcutt had any history of prior cooperation with the Alton police that might give them a basis to assess his credibility.

■ Some of the factors which demonstrate that an informant's information is sufficiently reliable to support the magistrate's issuance of a warrant include: (1) personal observation by the informant; (2) the degree of detail given; (3) independent police cor-

---

that he will find them there. *See Zurcher v. Stanford Daily,* 436 U.S. 547, 556, 98 S.Ct. 1970, 1976–77, 56 L.Ed.2d 525 (1978); *United States v.*

*Reddrick,* 90 F.3d 1276, 1281 (7th Cir.1996). It would, therefore, make little sense for Detective Adams to reference unsuccessful attempts.

roboration of the informant's information; and (4) the informant's testifying at the probable cause hearing. *United States v. Reddrick,* 90 F.3d 1276, 1280 (7th Cir.1996) (citing *United States v. Lloyd,* 71 F.3d 1256, 1262 (7th Cir.1995)).

In this case, the record does not show that Northcutt testified at the probable cause hearing. Secondly, although Northcutt's initial conversation with Detective Waldrup may have been general and Northcutt may have been confused as to the dates of his prior purchases, Northcutt was recounting his personal observations. Moreover, Northcutt's initial conversation did not form the basis for Detective Adams' affidavit. These shortcomings are of little consequence.

What is more important are the two buys which formed the basis for the warrant affidavit. Northcutt was first searched for contraband before each of the buys. Special Agent Kistner drove Northcutt to the destinations where the defendants instructed him to go. At any given time during these transactions, there was at least constant audio corroboration of Northcutt's actions. On July 21, Detective Waldrup was on mobile surveillance of the hidden recording device and Adams was on close surveillance of the Edgewood residence. Police also followed Larry Singleton and Cox. On July 28, Detective Waldrup was on mobile surveillance of the hidden recording device and Adams was on close surveillance of the Edgewood residence when Larry Singleton and Anthony Singleton conducted their hand-to-hand exchange on Anthony's front porch. Both Adams and Northcutt viewed this exchange. There was clearly independent, often contemporaneous, police corroboration. We find no error in the district court's denial of the motion to suppress.

**B.** *The Tapes*

1. *Audibility and the Matter of Transcripts*

■ Anthony Singleton and Cox argue that the district court abused its discretion when it found that the Northcutt and Yarborough tapes were sufficiently audible and trustworthy to be used as evidence against them. They also believe that the court abused its discretion when it allowed the jury to use written transcripts of the recordings. Specifically, they contend that Anthony Singleton's counsel compared the government's transcripts to the tapes to try to produce an official or stipulated transcript, pursuant to *United States v. Zambrana,* 841 F.2d 1320 (7th Cir.1988), but determined that so many portions of the tapes were inaudible that the tapes and transcripts should have been barred from presentation at trial.

■ We leave the decision to admit into evidence a recording which includes unintelligible portions to the sound discretion of the district court. *See United States v. Powers,* 75 F.3d 335, 341 (7th Cir.1996). A recording that is partially audible or unintelligible is admissible unless the inaudible portions are "so substantial as to render the recording as a whole untrustworthy." *Id.* (citing *United States v. Robinson,* 956 F.2d 1388, 1395 (7th Cir.), *cert. denied,* 506 U.S. 1020, 113 S.Ct. 654, 121 L.Ed.2d 581 (1992)).

Here, the district court judge listened to all of the tapes *in camera* and then met with counsel in chambers. The court found that the Yarborough tapes were "authentic and accurate and ... reliable," provided a proper foundation could be laid for them. As to the Northcutt tapes, the court found that "[t]here is no question about those at all in my view that those were all accurate, authentic and trustworthy." The court found that the tapes, for the most part, would be clearly audible to the jury. It concluded, "As with any tape, there may be spots in there that are not—are either inaudible or that there is a problem with, but that happens in every case and they will be properly instructed on both the tapes and the transcripts."

Anthony Singleton and Cox also argue that the danger that the jury will look only to the transcript "becomes critical when the tape is unable to be deciphered, because in those instances, the government is usurping the jury's role as fact finder, in that the jury is being essentially told what the tapes say, when there is no proper basis for them to make their own, independent decision." In other words, Anthony Singleton and Cox fear that the jurors relied solely on the tran-

scripts for those portions of the tapes which were inaudible.

■ The district court has broad discretion in deciding whether to allow the use of written transcripts to aid the jury in listening to recorded conversations. *United States v. Howard,* 80 F.3d 1194, 1199 (7th Cir.1996). Here, after determining that the tapes were reasonably intelligible, the district court gave the jury extensive precautionary instructions before the government played the first tape:

Ladies and gentlemen, the tape recording as you have heard of the conversation identified by this witness, I have received it into evidence and it will be played for you in a few moments. Transcripts of that tape are going to be furnished to you for your guidance in listening to the tapes and you will be able to clarify portions of the tapes which may be difficult to hear and to identify the speakers you hear on the tapes.

The tapes, however, what you hear, are the evidence in the case and the transcripts are not evidence. If you perceive any variation between what you hear on the tapes and the transcript, then you will be guided solely by what you hear and not by the transcripts.

If you cannot determine from the tapes or tape that particular words were spoken, you must disregard the transcripts insofar as those words are concerned. In other words, what you hear is the evidence and not what you see on the transcript. Those are just an aid or a guide.

I will instruct you now after the transcript is passed out to you that you are not to read the transcript or look at the transcript until after the tape starts. Then you can follow along while the tape plays on the transcript. . . .

■ The court repeated similar instructions throughout trial. For example, the next time a tape was played, the court again gave a detailed warning:

I will remind the jury that what you hear on the tapes, which the tape has now been admitted into evidence, is the evidence, and not what you may see on the transcript. So that if there is anything that is

not audible on the tape or that is at variance with the transcript, you will be governed by what you hear, not what you read. We will follow the same procedure as we did previously. That is that you may look at the transcript once the tape starts to play, and don't turn a page until I indicate that you may. In other words, don't try to read to the end of the story before we get through it.

When Anthony Singleton objected that a portion of a particular tape was exceptionally inaudible, the district court told the jury that Singleton's objection went "to the question of whether or not that tape is audible enough for your consideration." The court itself acknowledged that some parts of the tape were inaudible. The court went on to instruct the jurors to consider only those parts which they could understand and that only the parts which they could understand were evidence. Finally, at the close of all the evidence, the court repeated its earlier admonishments. From our standpoint, we presume that the jury complied with the district court's frequent and painstaking instructions. *See Howard,* 80 F.3d at 1200. The district court acted well within its discretion.

2. *Hearsay and Confrontation Clause Gripes*

■ At trial, over defense objections, the district court admitted into evidence the five tapes made by an unavailable informant, John Yarborough, which contained Yarborough's conversations with various defendants at various times. Yarborough was unavailable because he had disappeared after working with the Alton police. Despite police efforts to locate him, he had been missing for a year by the time of trial. The district court ruled that the tapes were sufficiently trustworthy that they were admissible under the residual exception to the hearsay rule. The court also found that because the tapes contained Yarborough's conversations with the parties in the case, the tapes could come in as party admissions.

On appeal, Anthony Singleton and Cox argue that the district court should not have allowed the Yarborough tapes to be played because they did not contain the requisite

"circumstantial guarantees of trustworthiness."[5] *See* FED.R.EVID. 804(b)(5). In addition, they contend that even if the contents of the tapes fell within the residual hearsay exception, their Sixth Amendment rights to confront and cross-examine Yarborough were violated when the district court allowed the tapes to be played.

We review the district court's findings as to the admissibility of evidence under Rule 804(b)(5) for abuse of discretion. *United States v. Seavoy,* 995 F.2d 1414, 1418 (7th Cir.), *cert. denied,* 510 U.S. 954, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993) (citing *United States v. Kladouris,* 964 F.2d 658, 663 (7th Cir.1992)). A hearsay statement is admissible under Rule 804(b)(5) if the proponent can demonstrate that the declarant is unavailable and the statement contains "circumstantial guarantees of trustworthiness equivalent to those inherent in the more specific exceptions provided under Rule 804(b)(1–4)." *United States v. Snyder,* 872 F.2d 1351, 1354 (7th Cir.1989). The district court is granted considerable discretion in its determination of "whether the hearsay statements contain the necessary circumstantial guarantees of trustworthiness." *Seavoy,* 995 F.2d at 1418 (citations omitted).

Anthony Singleton and Cox apparently concede Yarborough's unavailability, so we ask whether the tapes contained sufficient guarantees of trustworthiness. Anthony and Cox merely argue that the district court erred because Yarborough was not under oath and made no admissions against interest on the tapes, which prompts us to reply, "So what?" The factors the district court should consider in assessing the trustworthiness of hearsay testimony include:

(1) the character of the witness for truthfulness and honesty, and the availability of evidence on the issue; (2) whether the testimony was given voluntarily, under oath, subject to cross examination, and a penalty for perjury; (3) the witness' relationship with both the defendant and the government and his motivation to testify . . .; (4) the extent to which the witness' testimony reflects his personal knowledge; (5) whether the witness ever recanted his testimony; (6) the existence of corroborating evidence; and (7) the reasons for the witness' unavailability.

*United States v. Doerr,* 886 F.2d 944, 956 (7th Cir.1989) (citing *Snyder,* 872 F.2d at 1355–56). "This list of factors is neither exhaustive nor absolute, and each case must be analyzed on its own facts." *Id.* (citations omitted).

Here, many of the factors listed are irrelevant because *Doerr* involved grand jury testimony and in this case, Yarborough's "testimony" is on tape. But, analyzing this case on its own facts, corroborating evidence clearly existed. The procedure used in taping any or all of the defendants' conversations was very controlled. Alton police would equip Yarborough with a hidden transmitting device, Yarborough would talk with any or all of the defendants depending on the occasion, Yarborough would return to the police, and they would remove the device. The tapes often were monitored by Alton police as they were being made. Detective Waldrup, who testified at trial and who frequently monitored the tapes as they were being made, was familiar with the voices of Anthony Singleton and Cox. We therefore find no abuse of discretion in the district court's finding that there were sufficient indicia of trustworthiness.

The district court also found that "in our case here we have parties on the tape that these are tapes of the defendants themselves. Those are admission[s] of the party and they can come in for that reason." We agree. On appeal, the government contends

---

5. Under Federal Rule of Evidence 804(b)(5) (the residual exception to the hearsay rule where the declarant is unavailable), a statement where the declarant is unavailable as a witness is not excluded by the hearsay rule if it is

[a] statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

that the tapes contain adoptive admissions, and it cites cases that discuss admissions under Rule 801(d)(2)(B). But Anthony Singleton and Cox point out that on February 22, 1995, Yarborough had a taped conversation with Larry Singleton in which Yarborough refers to his transactions with Anthony Singleton and Cox. They argue that there could be no adoptive admission by either Anthony Singleton or Cox because neither of them was present for this conversation. They cite no relevant cases in support.

■ Anthony Singleton and Cox are correct to the extent that Rule 801(d)(2)(B) does not cover the disputed conversation. However, the disputed conversation is admissible under Federal Rule of Evidence 801(d)(2)(E). Under Rule 801(d)(2)(E), a statement made by a member of a conspiracy is admissible against other members of a conspiracy when the government proves by a preponderance of the evidence that (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy. *United States v. Powers,* 75 F.3d 335, 339 (7th Cir.1996) (citing *United States v. Stephenson,* 53 F.3d 836, 842 (7th Cir.1995)). We will reverse a district court's determination that a statement falls within Rule 801(d)(2)(E) only if that determination is clearly erroneous. *Id.* at 341–42.

■ Yarborough's February 22 conversation with Larry Singleton, as transcribed, reads in relevant part:

**Yarborough:** Damn man, I need a pound, god damn it. You got a pound?

**Larry Singleton:** No man, shit.

**Yarborough:** I'm trying to make some money, man, you all be, uh, I bought some shit last time, it wasn't even right, man.

**Larry Singleton:** Who from Skeeter [Cox]?

**Yarborough:** *Skeeter and Anthony. I bought directly from Skeeter for 350 or some shit, and then dude said he wanted another, I got that mother fucker, there and it was lighter than that but it was cheaper. So, he said, well god damn, if*

*there going to do you that way you make 'em weigh it, you know.*

**Larry Singleton:** Yeah.

**Yarborough:** So, I need another quarter if you got it.

**Larry Singleton:** You got to get up to them mother fuckers, Skeeter's running the street. You got their beepers, don't you?

**Yarborough:** Yeah man, but they won't call me back. Shit, they out with their whores. How much you got? Shit, I got to make me some money too, tonight man. Push that up a little bit for me to. Hey Larry?

Apparently, Anthony Singleton and Cox are referring to the emphasized language above. Their argument fails. This conversation clearly meets the requirements of Rule 801(d)(2)(E). Larry Singleton's statements were offered against Anthony Singleton and Cox, and Larry Singleton was a coconspirator. The statements were made during the course of a conspiracy and they were made to further the conspiracy. "The statement need not have been made exclusively, or even primarily, to further the conspiracy." *Powers,* 75 F.3d at 340 (citing *Garlington v. O'Leary,* 879 F.2d 277, 284 (7th Cir.1989)). The gist of the conversation was that Yarborough went to Larry wanting to buy a "pound" to sell and distribute, and Larry suggested that Yarborough should just call Anthony Singleton or Cox on their beepers because Cox was "running the street." During the course of the conversation, Yarborough also commented that whatever he bought last time was not "right." In response, Larry asked if Yarborough bought from Cox, and Yarborough replied that he bought from both Cox and Anthony Singleton. Yarborough then said that he should have made Cox weigh Yarborough's last purchase and Larry agreed.

■ Because the February 22 tape was properly admitted under Rule 801(d)(2)(E), its admission did not violate the Confrontation Clause of the Sixth Amendment. *United States v. Stephenson,* 53 F.3d 836, 842 (7th Cir.1995) (citing *United States v. Dugan,* 902 F.2d 585, 590 (7th Cir.1990); *United States v. Shoffner,* 826 F.2d 619, 630 n. 14 (7th Cir.),

**1108**

*cert. denied,* 484 U.S. 958, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987)).

### C. *Sentencing*

#### 1. *The Amount of Crack Attributable to Anthony Singleton and Cox*

 After considering the pre-sentence report ("PSR") and the evidence presented at trial and at sentencing, the district court determined that Anthony Singleton and Cox were accountable for in excess of 1.5 kilograms of crack. On appeal, Anthony Singleton and Cox argue that the district court's calculation was based in large part on the testimony of untrustworthy witnesses. Specifically, they argue that the witnesses were greatly motivated to lie in exchange for lighter sentences and that they testified to drug activity occurring at a time when Anthony Singleton was incarcerated. Finally, they argue that the testimony as to the number of daily customers was unsupported. They acknowledge that they face an "uphill battle" on this issue.

 We review the district court's determination of the amount of cocaine reasonably foreseeable to a defendant for clear error. *Howard,* 80 F.3d at 1202 (citing *United States v. Beler,* 20 F.3d 1428, 1431 (7th Cir.1994)). The court must make an explicit finding of the calculation of drug quantity and the offense level and how it arrived at the sentence. *United States v. Phillips,* 37 F.3d 1210, 1213 (7th Cir.1994) (citation omitted). A witness' credibility as to an estimated number of purchases is a matter for the district judge, who observed the witness' testimony first-hand. *Howard,* 80 F.3d at 1205 (citing *United States v. Clay,* 37 F.3d 338, 344 (7th Cir.1994); *United States v. Robinson,* 30 F.3d 774, 787 (7th Cir.1994)).

At sentencing, the district court judge remarked at the outset that he had gone back and reviewed his trial notes. He first set out what the testimony established as far as the conspiracy's hierarchy. The court determined that Anthony Singleton and Cox were the leaders of a crack distribution conspiracy and that the trial testimony of government witness Louis Lacey and others established that the crack normally flowed from Anthony Singleton and Cox, down through Larry Singleton, sometimes down through Lacey, whom the court found to be a "gopher," and finally down to the group's customers.

The court found credible Lacey's testimony that in 1994, he bought crack cocaine fifty times from Larry Singleton, usually in quantities of one-sixteenth of an ounce (one-tenth of a gram). The court also credited Lacey's testimony that in 1994, Larry Singleton had 100 to 150 daily customers at his residence and that Anthony Singleton and Cox supplied Larry Singleton. The court noted that Anthony Singleton could not have supplied Larry Singleton for part of 1994 because Anthony was incarcerated until April 1994. The court recounted that Lacey would call Anthony Singleton or Cox to arrange for Lacey's picking up the drugs for Larry Singleton. The court considered Lacey's testimony that he called Cox fifteen to twenty times and Anthony Singleton fifteen times and that each time he called they would bring fourteen to fifteen bags at a time, in one-sixteenth and one-eighth of an ounce quantities. The court noted that Lacey testified that he saw Cox sell to other customers at Larry's residence twenty or thirty times and, that on at least twelve occasions, he saw Anthony Singleton directly supply Larry with two parcels of crack cocaine, each of which weighed one-quarter of an ounce. Finally, the court credited Lacey's testimony that he bought directly from Anthony Singleton twice and that he was given crack cocaine for working on Anthony's car. The court then detailed the numbers that came from the direct testimony of other cooperating government witnesses, including Tonya Dinwiddie, who at one time lived with Larry Singleton, Yarborough (whose numbers came through the testimony of Detective Waldrup), and Northcutt. After recounting all of the testimony, the court concluded that Lacey's estimate was rather conservative.

The court determined that by a preponderance of the evidence, the amount of controlled substance reasonably foreseeable to Anthony Singleton and Cox was more than 1.5 kilograms of crack cocaine. The court estimated that Larry Singleton, whom Anthony Singleton and Cox supplied, had 100

daily customers. This figure was at the low end of Lacey's estimate. The court determined that each customer would buy one-sixteenth of an ounce, or one-tenth of a gram. This was also a rather conservative figure, given the testimony which the court recounted. The court shaved off sixty-five days from 1994, which left the number of days of activity at 300. The court then multiplied these figures and arrived at a figure of 3,000 grams or three kilograms. The court observed that this was twice the 1.5 kilograms that must be shown for the maximum offense level.

The court's estimate of 300 days of activity differed from Lacey's testimony that he only worked with Larry Singleton for seven to eight months, not a full year. Seven to eight months would amount to 210 to 240 days, not 300. But this estimate does not seem unreasonable, given that the court made a conservative estimate both as to the number of customers and the usual amount involved in each purchase and given the court's recounting of the trial testimony. The court stated, "The defendant's argument that it is not credible to believe that there were that many customers there a day, and there being no further evidence of it, it is not persuasive to me because of all of the various transactions that we had direct testimony about, the number of times that either Singleton, Anthony Singleton or Cox, were called and deliveries were arranged or arrangements made for Louis Lacey or Tonya Dinwiddie or Larry Singleton to go to the residence to pick up the dope." It is clear from the court's remarks that, in determining the number of days of activity, it considered the numbers that came from the testimony of several other witnesses, not just Lacey.

The district court set out a detailed analysis of the trial testimony and, given this testimony, made a rather conservative estimate of the amount of crack reasonably attributable to Anthony Singleton and Cox, as the head suppliers of a crack distribution conspiracy. We find no clear error in its determinations.

### 2. Possession of Firearms

■■■■ The district court enhanced Anthony Singleton's and Cox's sentences by two levels after finding that both men possessed firearms. Anthony Singleton and Cox argue that there was no evidence at any stage of the proceedings to indicate that they ever possessed a firearm during any drug transactions or activity. They stress that at the time of their arrest, neither of them had firearms on their person. They concede that weapons were seized at the Edgewood residence at the time of their arrest, but they argue that there were several other people present, who were ultimately charged with weapon offenses. Neither the defendants nor the government offers any case law on the issue.

■■■■ We review the district court's enhancement for possession of a firearm under U.S.S.G. § 2D1.1(b)(1) for clear error. *See United States v. Pippen,* 115 F.3d 422, 425 (7th Cir.1997); *United States v. Hickok,* 77 F.3d 992, 1007 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 1701, 134 L.Ed.2d 800 (1996). U.S.S.G. § 2D1.1(b)(1) requires this enhancement "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *Pippen,* 115 F.3d at 425–26 (citations omitted).

Detective Waldrup's testimony established that Alton police recovered six weapons from the Edgewood residence when they executed a search warrant on July 28, 1995. Police found one loaded semi-automatic gun on the living room floor; one semi-automatic gun beneath the cushion of the living room sofa, two guns and a gun box in a hallway closet down the hall from Mamie Singleton's bedroom, an unloaded gun underneath the mattress of Mamie Singleton's bed, and a loaded gun in a kitchen cabinet. Police also recovered a bag of bullets lying on the mattress of Anthony Singleton's bed and another bag of bullets lying directly next to the crack cocaine underneath the mattress. Anthony Singleton and Cox were found sitting on Anthony Singleton's bed in Anthony's bedroom, which was located just off the kitchen.

The district court found that the testimony established the Edgewood residence was a crack cocaine distribution center containing a "small arsenal of six weapons." The district court determined that even if it disregarded all of the other weapons, there was still a loaded gun in the kitchen cabinet just a short distance from Anthony Singleton's bedroom

where he was arrested with Cox. The court also noted that Anthony Singleton and Cox were arrested while sitting on Anthony's bed, on top of which was a bag of ammunition, and underneath the bed's mattress was a bag of crack cocaine and another bag of ammunition. The court found that this

> would go to show that the defendant did, in fact, possess a firearm during this conspiracy and could easily be inferred that these firearms were placed strategically around the house so that they would be readily available during a transaction when someone, some unwelcome person, came calling, so I think that there is, and I find by [a] preponderance of the evidence that there is sufficient [evidence] to show that the defendant did possess a firearm....

The district court was entitled to infer that Anthony Singleton and Cox possessed the guns under circumstances that connected the guns to the drug crime. The district court noted that the Edgewood residence was a crack cocaine distribution center and the headquarters of the conspiracy. The district court reasonably inferred that guns were stashed strategically throughout the residence for the purpose of protecting the large sums of cash and the drugs. One loaded gun was found in the kitchen in close proximity to Anthony Singleton's bedroom and Anthony Singleton and Cox were found sitting on Anthony's bed which had ammunition lying on it and ammunition and crack cocaine lying underneath the mattress. It was not "clearly improbable" that at the very least the loaded weapon in the kitchen together with the ammunition next to Anthony and Cox were connected to the conspiracy's drug distribution. *See Pippen,* 115 F.3d at 426 (finding that the defendant's gun was connected to his drug activity because the defendant kept the gun at a friend's home where the defendant lived and conducted drug transactions). The district court committed no clear error.

### Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.