In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 14-1015

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ERIC KELLY,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 3:12-cr-50049 — **Frederick J. Kapala**, *Judge.*

———————————

ARGUED OCTOBER 2, 2014 — DECIDED NOVEMBER 26, 2014

———————————

Before FLAUM, MANION, and HAMILTON, *Circuit Judges.*

FLAUM, *Circuit Judge.* Based on evidence recovered during a police search of his apartment, defendant Eric Kelly was charged with possession of crack cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); and possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). Although the search was authorized by a warrant, Kelly seeks to suppress

the seized evidence on Fourth Amendment grounds. He contends that the government failed to establish probable cause to support the issuance of the warrant and that the search exceeded the warrant's scope. Because we conclude that the warrant was valid and that the officers' search was proper, we affirm the district court's denial of Kelly's motion to suppress.

## I. Background

On April 4, 2012, Detective Mark Jimenez of the Rockford Police Department applied for a warrant to search the "upper apartment" of a "multiple family residence" located at 1522 Clifton Avenue in Rockford, Illinois, for cocaine and a wide variety of narcotics paraphernalia. Detective Jimenez, an investigator in the Narcotics Unit, submitted a supporting affidavit representing that he had been an officer with the Rockford Police Department for twenty-one years, during which time he had been involved in the execution of over 700 narcotics search warrants.

Jimenez's affidavit contained the following relevant information suggestive of criminal activity at 1522 Clifton: First, on February 9, 2012, a "concerned citizen" contacted the Rockford Narcotics Unit and complained that "the residence located at 1522 Clifton Avenue … is dealing drugs on a daily basis." Approximately six weeks later, on March 28, 2012, the police department received a welfare check complaint from a woman named Patsy Ibarra. Ibarra advised Officer Amy Kennedy that Ibarra's daughter, Precious Love, "was possibly being held against her will" at the upper apartment of 1522 Clifton by a black male named "Eric." According to Ibarra, her granddaughter, Sherona Barnes, had knocked on the rear door of the building in search of Love. Kelly, holding a 9mm handgun, answered her knock and

yelled, "You almost got yourself shot!" With Love standing behind him, Kelly slammed the door in Barnes's face and warned, "Go ahead and call the police, I'll shoot them too."[1] Ibarra's complaint prompted Officer Kennedy to visit the residence. Love greeted Kennedy at the building's rear door—which was outfitted with surveillance cameras—and denied that she was being held against her will. Officer Kennedy saw Love descend a set of interior stairs to reach the rear door, leading Kennedy to conclude that Love had come from the upper apartment.

Days later, Jimenez used a confidential informant to make a controlled purchase of crack cocaine from 1522 Clifton, "upper apartment." The informant—who had previously aided the police department in securing several drug convictions—called Kelly at his listed telephone number to arrange a purchase of crack cocaine, but when he met Kelly at the rear door of the building, Kelly told the informant that he would not sell drugs from inside the apartment. They later arranged to make the exchange down the street from 1522 Clifton. Officers observed Kelly walk from behind 1522 Clifton; enter a blue Buick, which was registered to him at a different address; and drive to the agreed-upon location. The informant entered the Buick, remained inside for less than a minute, and immediately returned to Jimenez's undercover vehicle. There, the informant revealed his purchase—a small plastic bag containing a rocklike substance that field tested positive for cocaine.

---

[1] Barnes herself never spoke with the Rockford Police Department. Rather, she conveyed these events to Ibarra, who then made the complaint.

Jimenez asserted that, taken together, this information established probable cause that evidence of drug-related criminal activity would be found at the upper apartment of 1522 Clifton Avenue. Jimenez's supporting affidavit described the precise location to be searched as

> 1522 Clifton Avenue, upper apartment, Rockford, Illinois[,] … a two story, white with red siding and red trim, multiple family residence, located on the east side of Clifton Avenue, with the numbers "1522" located on the front of the residence, and the upper apartment is located on the second floor of this building.

Associate Judge Ronald J. White of the Circuit Court of Winnebago County promptly issued a search warrant.

On April 6, 2012, Detective Jimenez and a team of Rockford police officers forcibly entered 1522 Clifton through the building's rear door. Once inside the outer door, the officers encountered two staircases—one leading up to an upper interior door and the other leading down to a lower interior door, which opened into the basement. They climbed to the upper door, announced their presence, and forced the door open. They were then standing inside Kelly's apartment, where they observed Kelly at the top of another internal staircase, walking quickly from the apartment's north bedroom to the south bedroom. Upon Jimenez's order, Kelly exited the south bedroom and surrendered to the officers. According to Jimenez, it was at that moment that he realized that Kelly lived not in an "upper apartment" but rather, in a two-story unit at the rear of 1522 Clifton. Although the officers had correctly surmised that the building was divided into two apartments, they learned that it was in fact bisected

into front and rear multi-story units—not upper and lower single-story units, as Jimenez had asserted in the warrant application.

Despite this realization, the officers continued their search of Kelly's apartment. In the north bedroom, Jimenez noticed that a vent cover had been removed from the wall, exposing a heating duct. Jimenez suspected that Kelly had thrown contraband down the duct in a frantic attempt to hide it from the officers. To determine where the duct led, one officer threw items into the shaft while another walked down to the building's basement in an effort to hear the items land on the other end. That officer entered the basement from the lower rear staircase and walked through an unlocked door dividing the rear of the basement from the front. In the front room—which contained a furnace, a washing machine, and heating ducts—he heard the items dropped from two stories above land behind a vent cover. The officer took apart a portion of the ductwork and recovered a 9mm handgun and two bags of crack cocaine.[2] In addition to the items retrieved from the heating duct, the officers discovered marijuana, crack cocaine, and extensive drug

---

[2] The owner of the building at 1522 Clifton later clarified that the rear portion of the basement was considered part of the rear apartment, which Kelly occupied. The front portion—where the officer recovered the contraband from the duct—belonged to the tenants of the front apartment. The door between the two basement rooms was intended to remain locked at all times. Based on this testimony, we conclude that the front portion of the basement is properly characterized as the exclusive province of the front apartment tenants. It is not, as Kelly contends, a common area.

paraphernalia on the first and second floors of Kelly's apartment.

Kelly moved to suppress all evidence the officers recovered, arguing that the search of all three levels of 1522 Clifton exceeded the scope of the warrant, which only authorized a search of the nonexistent "upper apartment." Following a suppression hearing, the district court denied Kelly's motion. The court determined that the erroneous description of the unit as an "upper," as opposed to a "rear," apartment was a mere technical error—and a reasonable one at that. Detective Jimenez based his description of Kelly's unit as an "upper apartment" on statements made by both Officer Kennedy and the confidential informant and there was no doubt that the probable cause that Jimenez established applied to the unit that the officers actually searched. Although it became obvious once the officers entered the building that they had been mistaken as to its layout, it was equally obvious that they were in the originally targeted apartment—that is, the apartment to which the rear door of 1522 Clifton led. With respect to the contraband retrieved from the basement, the court concluded that Kelly, who did not testify at the suppression hearing, failed to demonstrate a reasonable expectation of privacy in the basement's front section. He therefore lacked standing to challenge the seizure of the items from the duct.

In light of the district court's ruling, Kelly entered a conditional guilty plea pursuant to Federal Rule of Criminal Procedure 11(a)(2), reserving the right to challenge the court's denial of his suppression motion. The district court sentenced him to a total of 123 months' imprisonment (composed of concurrent 63-month sentences on the drug possession and

felon-in-possession of a firearm charges and a 60-month sentence for possession of a firearm in furtherance of a drug trafficking crime, to be served consecutively to the first two). Kelly now appeals the denial of his motion to suppress.

## II. Discussion

We review a district court's denial of a suppression motion under a dual standard of review: legal conclusions are reviewed de novo, while factual findings are reviewed for clear error. *United States v. Freeman*, 691 F.3d 893, 899 (7th Cir. 2012).

### A. Probable Cause

Kelly's first contention on appeal is that the warrant application failed to establish probable cause for the search warrant's issuance.[3] As a threshold matter, we must determine

---

[3] On appeal, Kelly alleges numerous defects in Detective Jimenez's supporting affidavit. First, he complains that the affidavit, which stated that Kelly had a gun when he encountered Sherona Barnes, failed to mention that Kelly had a prior felony conviction that would render his possession of a firearm illegal. He also argues that Patsy Ibarra's welfare check complaint is suspect because Ibarra's accusation that Love was being held by Kelly against her will was based on second-hand information from Barnes, who never spoke with the police directly. Kelly further challenges the reliability and veracity of the anonymous tip from the "concerned citizen," who made only a generalized allegation of drug activity at 1522 Clifton. Similarly, Kelly highlights the fact that the confidential informant purchased drugs from Kelly's car rather than from the apartment, thereby failing to establish the necessary link between drug activity and the apartment itself. Finally, Kelly complains that Jimenez's affidavit did not identify a lease or other records connecting Kelly to the apartment. Therefore, Kelly concludes, the search warrant application

whether Kelly raised the issue of probable cause—which the district court did not address—in a manner sufficient to preserve the argument for appeal. Kelly concedes that before the district court, he "unquestionably focused on the failure to correctly identify the place to be searched" but argues that "he neither waived nor completely neglected a probable cause argument." But Kelly never alleged in his motion to suppress that the warrant application failed to connect his residence to criminal activity. Rather, the sole references to probable cause were made in the context of a broader argument challenging the warrant's particularity:

> [T]he search warrant fails to describe the area searched with the requisite particularity. The warrant is explicitly limited to the upper apartment, and no other portion of the residence. The issuing court was not presented with any evidence establishing probable cause to search the basement of the building at 1522 Clifton Avenue in Rockford, Illinois. Nor was the issuing court presented with any evidence establishing probable cause to search the rear apartment nor the first floor of the building located at 1522 Clifton Avenue … .

The essence of Kelly's argument was that the warrant application, in its description of the residence as an "upper apartment," failed to accurately describe the apartment's

---

did not establish probable cause that evidence of a crime would be found in the apartment at 1522 Clifton.

floor plan, not that the application failed to establish proba-
ble cause of drug activity in the apartment.

In a strained effort to demonstrate that he preserved the
probable cause argument below, Kelly cites various isolated
comments by defense counsel at the suppression hearing
that could potentially be construed as challenging the war-
rant application's failure to establish a connection between
criminal activity and 1522 Clifton. At one point, defense
counsel highlighted the fact that Kelly's Buick was registered
to a different address. Counsel also pointed out that "prior
to obtaining th[e] search warrant, no one in law enforcement
had personal knowledge of ever seeing Mr. Kelly in that unit
nor did they have any mail or other information tying Mr.
Kelly … to that apartment." But once again, these remarks
were made in furtherance of the argument that the war-
rant—on account of its erroneous description of the apart-
ment's layout—lacked sufficient particularity; defense coun-
sel never attempted to tie the remarks to the independent
question of probable cause. Finally, in the brief conclusion
section of Kelly's post-hearing memorandum in support of
his motion to suppress, he noted that "no members of law
enforcement had any information that showed [he] was
listed as residing at 1522 Clifton." Although these isolated
remarks could be construed as relevant to probable cause,
Kelly nowhere—neither in his initial briefing, during the
suppression hearing, nor in his post-hearing briefing—
explicitly argued that the warrant failed for lack of underly-
ing probable cause.

We have rejected similar arguments from other defend-
ants seeking to demonstrate that they preserved issues for
appeal. In *United States v. Murdock*, a criminal defendant

moved to suppress his confession on the ground that police did not first administer *Miranda* warnings. 491 F.3d 694, 695 (7th Cir. 2007). On appeal, however, Murdock introduced a new theory in support of his motion to suppress: his confession, he claimed, was involuntary as a result of the "suspect, intimidating, and overreaching conditions under which he was held." *Id.* at 698 (internal quotation marks omitted). In an effort to argue that he had satisfactorily raised that theory below, Murdock contended that his arguments before the district court regarding the alleged *Miranda* violation were "sufficient to encompass his argument on appeal." *Id.* However, we held this to be insufficient, concluding, "we see no reason why trial counsel could not have broadened his argument, and by failing to do so he gave the government no reason to offer evidence to rebut his new allegation." *Id.* at 698–99; *see also United States v. Acox*, 595 F.3d 729, 732–33 (7th Cir. 2010) (rejecting defendant's contention that his counsel's statements at trial came "close enough" to the argument raised on appeal to preserve the question). Like Murdock's attempt, Kelly's sporadic references to probable cause in the context of a particularity challenge were insufficient to raise the argument before the district court.

Yet this conclusion does not necessarily foreclose all appellate review. We must next evaluate whether Kelly's failure to raise his probable cause challenge before the district court amounted to a mere forfeiture of the argument—which would typically entitle him to plain error review—or to a waiver of the argument, which would preclude our review entirely. *United States v. Jaimes-Jaimes*, 406 F.3d 845, 847 (7th Cir. 2005). Waiver occurs through an "*intentional* relinquishment of an argument," while forfeiture is characterized

by a "*neglectful* failure to pursue an argument." *United States v. Johnson*, 415 F.3d 728, 730 (7th Cir. 2005).

Kelly's failure to present his probable cause argument appears to have been a result of neglect, rather than a calculated strategic decision. We can imagine "no sound reason—indeed no reason at all—why [Kelly] would have opted to bypass" the probable cause argument and instead rely solely on his particularity challenge, *Jaimes-Jaimes*, 406 F.3d at 848, which renders his omission more akin to forfeiture than waiver. However, because the forfeited argument here is a suppression argument, we face a "special situation" as a result of the operation of Federal Rule of Criminal Procedure 12(e). *Murdock*, 491 F.3d at 698. Under Rule 12(e), if a defendant fails to raise a suppression argument below—even if he does so under circumstances that suggest a forfeiture—we cannot proceed directly to a review of the district court's actions for plain error.[4] Before we may conduct a plain error review, "the defendant must first show good cause for failing to make that argument in the district court." *Murdock*, 491 F.3d at 698. Kelly has offered no explanation—let alone a persuasive one—for trial counsel's failure to challenge

---

[4] Federal Rule of Criminal Procedure 12(e) establishes that a party "waives" a suppression argument not timely raised before the district court; such waiver may only be overcome by a showing of "good cause." As we have noted, this "use of the word 'waiver' when one actually means 'forfeiture' has led to some difficulty distinguishing the two terms." *Murdock*, 491 F.3d at 698. Although Kelly's failure to raise the probable cause argument below constitutes a forfeiture in the traditional sense, Rule 12(e) prevents us from automatically undertaking plain error review.

probable cause. *See id.* at 698–99. We are therefore foreclosed by Rule 12(e) from any review of whether the government established probable cause to support the issuance of the search warrant.

But even assuming that Kelly could demonstrate good cause for failing to raise the argument below, he cannot show that the district court committed plain error. A district court does not engage in de novo review of an issuing judge's conclusion that, based on the totality of the circumstances, there was a "fair probability that contraband or evidence of a crime w[ould] be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Rather, in reviewing the issuing judge's probable cause determination, the district court need only evaluate whether the judge had a "substantial basis" for concluding that probable cause existed. *Id.* at 238–39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). "Warrants may be issued even in the absence of direct evidence linking criminal objects to a particular site." *United States v. Orozco*, 576 F.3d 745, 749 (7th Cir. 2009) (citation and internal quotation marks omitted). And courts are "entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense, and specifically, in the case of drug dealers, evidence is likely to be found where the dealers live." *Id.* (citation and internal quotation marks omitted).

Detective Jimenez's affidavit establishes a reasonable probability that Kelly dealt drugs. Just days before Jimenez filed his warrant application, officers observed Kelly emerge from behind 1522 Clifton, enter his Buick, drive to meet a reliable informant at a predetermined location, and sell the informant crack cocaine. The informant had previously met

Kelly at the rear door of 1522 Clifton and, although Kelly represented to the informant that he would not *sell* drugs from the apartment, he made clear to the informant that he would be happy to arrange a sale in the neighborhood. Jimenez also concluded, based on his twenty-one years in law enforcement and his execution of over 700 narcotics search warrants, that drug dealers are likely to keep contraband in their residences. Because issuing magistrates are entitled to take into account the knowledge and experience of police officers when making the probable cause determination, *see United States v. Lamon*, 930 F.2d 1183, 1189 (7th Cir. 1991), Jimenez's observation, taken together with the facts and circumstances surrounding the informant's controlled purchase of crack cocaine, certainly creates a "fair probability" that drugs or drug paraphernalia would be found at 1522 Clifton.

Even without taking into consideration the anonymous tip from the "concerned citizen" or the welfare check complaint from Patsy Ibarra,[5] Jimenez's affidavit contained far

---

[5] Kelly alleges that reports from both the "concerned citizen" and Ibarra are inherently unreliable, due largely to the anonymity of the former and the second-hand nature of the latter. In *United States v. Singleton*, 125 F.3d 1097 (7th Cir. 1997), we set forth a series of factors indicative of whether an informant's report is sufficiently reliable to support a magistrate's finding of probable cause. These factors include: "(1) personal observation by the informant; (2) the degree of detail given; (3) independent police corroboration of the informant's information; and (4) the informant's testifying at the probable cause hearing." *Id.* at 1103–04.

With respect to the vague tip from the anonymous "concerned citizen," the *Singleton* factors admittedly cut in Kelly's favor. Ibarra's welfare complaint presents a closer case. Ibarra provided an exceptional

more evidence to support the issuance of a search warrant than we have required in other cases. In *United States v. Orozco*, for instance, an affidavit in support of a search warrant application stated that reliable sources had identified the defendant as a "large-scale drug trafficker" from whom they had purchased drugs "in the recent past." 576 F.3d at 748. This information, combined with the FBI Special Agent affiant's representation that high-ranking gang members often keep evidence of drug activity in their homes, persuaded us to uphold the magistrate judge's probable cause finding— even though the agent's belief was "the only support for a link between Orozco's home and the sought-after evidence of drug dealing." *Id.* at 748–50. Detective Jimenez's affidavit offered far more concrete evidence suggesting that Kelly kept drugs and drug-related paraphernalia at 1522 Clifton. We therefore conclude that the affidavit plainly established probable cause to support the issuance of the warrant.[6]

---

amount of detail, some of which was corroborated by Officer Kennedy when she investigated the residence herself, but Ibarra did not personally observe Kelly's actions, nor did she testify at the probable cause hearing. We need not weigh these competing factors here, however, because we conclude that—exclusive of the information contained in Ibarra's complaint—Jimenez's affidavit set forth sufficient facts to support the issuing judge's finding of probable cause.

[6] Both parties' briefs discuss in detail whether, in the absence of probable cause, the good-faith exception—which preserves evidence recovered during a search pursuant to a defective warrant that was obtained by an officer acting with objective good faith, *see United States v. Leon*, 468 U.S. 897, 920 (1984)—would save the officers' search of 1522 Clifton. Because we conclude that probable cause in fact existed, the good-faith exception is not implicated here.

**B. Scope of the Warrant**

Kelly next contends that even if the warrant was supported by probable cause, the officers' search exceeded its scope, which authorized a search of only the "upper apartment" at 1522 Clifton. Kelly first claims, as he argued before the district court, that the warrant fails for want of particularity. The Fourth Amendment requires that a warrant "particularly describ[e] the place to be searched." U.S. Const. amend. IV. Kelly argues that because the warrant identified that place as the "upper apartment" of 1522 Clifton, which (as it turns out) does not exist, the warrant was invalid from the moment it was issued. However, the particularity requirement was not intended to protect against the error at issue here—that is, where a warrant supported by probable cause fails to reflect the precise floor plan of the premises to be searched. Rather, the "manifest purpose" of the requirement is to prevent "the wide-ranging exploratory searches" that the Framers faced and to limit each search "to the specific areas and things for which there is probable cause." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

The Supreme Court does not demand exact precision in a search warrant's description of the targeted premises. Instead, it has found the particularity requirement to be satisfied if the warrant's description "is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended." *Steele v. United States*, 267 U.S. 498, 503 (1925). Our own precedent confirms that minor technical errors or omissions do not automatically invalidate a warrant so long as there is no danger that the officers might inadvertently search the wrong place. In *United States v. Johnson*, a warrant to search both the upper and lower

units of a two-story residence identified the address as "2958 N. 23rd Street." 26 F.3d 669, 692 (7th Cir. 1994). While this was the correct address for the lower unit, the upper unit's address was technically 2958A. *Id.* at 694. Despite this error, we upheld the search warrant with respect to both units:

> [W]e note that the warrant did describe the place to be searched with particularity stating that the house was "a two-family residence with beige siding and brown trim; the number 2958 appearing on the west side." The only problem with the description was that it did not include the fact that 2958A is the address of the upper unit. This omission, however, is not fatal for the warrant accurately described the house to be searched and there was no risk that the officers executing the warrant would search some other house.

*Id.* While *Johnson* dealt with the omission of the upper unit's address rather than a misstatement regarding the layout of the targeted residence, its reasoning is applicable here. Detective Jimenez knew that the target of his search was the unit—be it the "upper" unit or the "rear" unit—to which the rear door of 1522 Clifton led. And because Kelly's apartment was the only unit accessible from the rear door of the building, the mislabeling presented "no risk that the officers executing the warrant would search some other house." *Id.*

The Supreme Court has upheld the validity of warrants in far closer cases. In *Maryland v. Garrison*, the Court upheld an overbroad warrant that described the apartment to be searched as "2036 Park Avenue third floor." 480 U.S. at 80. What police officers did not realize prior to the warrant's

execution was that the third floor of 2036 Park Avenue in fact contained two apartments. *Id.* After acknowledging that the warrant's description was "broader than appropriate because it was based on the mistaken belief that there was only one apartment on the third floor," the Court nevertheless concluded that the factual mistake did not invalidate a "warrant that undoubtedly would have been valid if it had reflected a completely accurate understanding of the building's floor plan." *Id.* at 85. The Court emphasized that its finding of validity depended on the information available to the officers at the time they applied for the warrant—"[t]hose items of evidence that emerge after the warrant is issued have no bearing on whether or not a warrant was validly issued." *Id.* As in *Garrison*, the warrant to search Kelly's apartment would "undoubtedly" have been valid if it had identified the unit to be searched as a "rear," as opposed to an "upper," apartment. The fact that the building's layout differed from what the officers were able to discern without having been inside is insufficient to render the warrant invalid.[7]

---

[7] Kelly contends that the officers could have discovered the precise layout of 1522 Clifton, either by contacting his landlord or by obtaining the building's floor plans. But Detective Jimenez testified at the suppression hearing that, based on his experience, he does not contact landlords of buildings for which he seeks search warrants out of fear that they might warn tenants of the impending search by, for example, confronting tenants about engaging in potentially illegal behavior on the rental property. Moreover, Kelly cites no authority to support the proposition that officers must go to such lengths to ascertain a building's internal layout, and there is no evidence concerning where a floor plan for 1522 Clifton might be found, if it exists at all.

Our conclusion that the warrant was valid based on the information available to the officers at the time of its issuance does not, however, address the independent inquiry of whether it was executed in a reasonable manner. *See id.* at 84 (noting that "the case present[ed] two separate constitutional issues, one concerning the validity of the warrant and the other concerning the reasonableness of the manner in which it was executed"). Kelly argues that the Fourth Amendment required the officers to halt their search upon the realization that they were in a "rear" apartment—or, at a minimum, to search only the "upper" level identified in the warrant. He cites *Garrison* for this proposition because there, the Supreme Court obliged the officers to discontinue their search when they learned that the layout of the building differed from the warrant's description—that is, that the third floor contained two apartments instead of one. *See id.* at 87.

Yet although *Garrison* also presented a situation of mistaken floor plans, the parallels with the instant case end there. In *Garrison*, the officers sought a warrant to search the apartment of Lawrence McWebb, which they reasonably believed to occupy the entire third floor of 2036 Park Avenue. *Id.* at 80. However, they inadvertently searched—and found contraband in—the apartment of Garrison, which was also located on the third floor but was not the intended target of their search. *Id.* at 81. The Supreme Court concluded that the Fourth Amendment compelled the officers to suspend their search upon realization of their mistake not because they had misunderstood the building's layout but rather because they had been searching the *wrong* apartment—a search concededly unsupported by probable cause. *Id.* at 86–87. And notably, even despite this grievous mistake, the Court permitted the government to prosecute Garrison based on

incriminating evidence found in his apartment before the officers discovered their error. *See id.* at 80, 88.

The *Garrison* Court nowhere suggested that if, after discovering the mistaken layout, the officers had been able to confirm that they were in the targeted apartment (McWebb's), a continued search of that apartment would have been improper. In fact, the Court concluded that "[i]f the officers had known, or should have known, that the third floor contained two apartments …, and thus had been aware of the error in the warrant, *they would have been obligated to limit their search to McWebb's apartment.*" *Id.* at 86 (emphasis added). Therefore, contrary to Kelly's contention, *Garrison* supports the reasonableness of the search conducted here. The officers limited their search to the targeted apartment[8] and, because only one apartment was accessible from the door through which they entered the building, there was no risk that they might inadvertently have searched the wrong unit. As a result, Detective Jimenez was not constitutionally required to seek a modified warrant before continuing his search of all three levels of Kelly's residence.

### C. Search of the Basement Duct

The parties dispute whether Kelly had a reasonable expectation of privacy in the basement end of the duct. But Kelly's challenge to the officers' recovery of the gun and drugs from the duct fails under either theory.

---

[8] Because they encountered Kelly upon entry, the officers immediately confirmed that they were in the correct apartment.

A "search" within the meaning of the Fourth Amendment occurs only where an individual has a reasonable expectation of privacy in the area searched. *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). If such an expectation is lacking, the individual has no standing to challenge the search. *See Simmons v. United States*, 390 U.S. 377, 389 (1968). In *United States v. Mitchell*, we laid out a series of factors relevant to this determination:

> (1) whether the defendant had a possessory interest in the place searched; (2) whether he had a right to exclude others from the place searched; (3) whether he exhibited a subjective expectation that the place searched [would] remain free from governmental invasion; (4) whether he took normal precautions to protect his privacy; and (5) whether he was on the premises legitimately.

64 F.3d 1105, 1109 (7th Cir. 1995). The district court concluded, based on an analysis of the *Mitchell* factors, that Kelly had no reasonable expectation of privacy in the front portion of the basement. The owner of the building testified (via stipulation) that the front section of the basement was considered part of the front apartment and that the door between the basement's front and rear sections was supposed to remain locked. The court determined that, as a tenant of the rear apartment, Kelly's Fourth Amendment rights were not infringed when the officers searched the duct housed in the front portion of the basement, and he therefore lacked standing to challenge the officers' actions.

Kelly insists that the district court erred in analyzing his asserted expectation of privacy in the front portion of the

basement rather than in the interior of the duct itself. He claims a privacy interest in the duct because it was both attached to and accessible from his apartment, and because no evidence indicated that it was used by anyone else. Yet Kelly's position—which the government contests—cannot save his Fourth Amendment challenge. If we were to hold that Kelly had a reasonable expectation of privacy in the basement duct because it was attached to the apartment he rented, we would be conceptualizing the duct as an extension of Kelly's apartment. And we have already determined that the officers had in their possession a valid warrant, which they executed reasonably, to search that apartment.

Because Kelly's challenge to the recovery of contraband from the basement duct is doomed regardless of which line of reasoning we adopt, we need not determine whether an individual is entitled to Fourth Amendment protection with respect to an enclosed heating duct whose contents may only be retrieved from an area in which that individual has no expectation of privacy.[9]

---

[9] Kelly also challenges the district court's assumption that he abandoned the firearm and drugs by throwing them into the duct. In order to demonstrate abandonment, "the government must prove by a preponderance of the evidence that the defendant's voluntary words or actions would lead a reasonable person in the searching officer's position to believe that the defendant relinquished his property interests in the item to be searched." *United States v. Pitts*, 322 F.3d 449, 456 (7th Cir. 2003). Although Kelly claims that he threw the contraband into the vent only to temporarily hide it from the investigating officers, his subjective intent is irrelevant to the objective abandonment inquiry. We need not conduct that inquiry here, however, because whether or not Kelly retained any property interest in the discarded items, we hold that the officers' seizure

### III. Conclusion

For the foregoing reasons, we AFFIRM the order of the district court.

---

of the contraband from the basement duct did not violate his Fourth Amendment rights.