In the

# United States Court of Appeals

## For the Seventh Circuit

No. 24-2892

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FLOYD L. SUGGS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:22-cr-00084 — **Franklin U. Valderrama**, *Judge.*

ARGUED NOVEMBER 4, 2025 — DECIDED MARCH 17, 2026

Before EASTERBROOK, KIRSCH, and KOLAR, *Circuit Judges*.

KOLAR, *Circuit Judge*. Floyd Suggs appeals the district court's order denying his motion to suppress. He argues for suppression based upon an overbroad warrant—the warrant at issue identified the location of the search as a single-family home, when it should have identified the structure as a multi-unit dwelling and specified the unit to be searched. He also argues for suppression claiming agents executed the warrant unreasonably after they should have realized that they were

at a building with multiple units. We hold otherwise: the agents' investigation of the facts contained in the warrant, and their execution of it, were reasonable. And even if we doubted the warrant or agents' execution of it, long-recognized exceptions to the warrant requirement apply here, as discussed below. Accordingly, we affirm.

## I. Background

The parties do not dispute the material facts relevant to this appeal. Federal law enforcement began investigating Suggs's Chicago address in October 2021, when a United States Postal Inspector, Thomas McKeown, identified a suspicious parcel sent to the address from Tucson, Arizona. Four months later, McKeown identified another suspicious parcel also sent from a Tucson address to the Chicago address, though not to Suggs specifically. A K9 unit inspected this second parcel and alerted, suggesting narcotics were present. Based on this alert, McKeown obtained a warrant to search the parcel. Inside he found three Ziploc bags wrapped in layers of paper and tape and filled with blue pills. The pills, around 3,000 total, tested positive for fentanyl. McKeown estimated they were worth up to $20,000.

McKeown then planned a controlled delivery of the pills to Suggs's address. He sought a tracker warrant permitting him to place a GPS device in the parcel, and an anticipatory search warrant permitting him to search the premises at the delivery address. His request included a proposed "triggering event" whereby a warrant would kick in—probable cause to search would arise—once agents delivered the parcel and it was opened inside. But his warrant application contained

an error: he described the address as a "single-family resi-dence," when the address in fact contained two units.

As discussed below, we must focus on whether McKeown knew or should have known that the address contained two units at the time he signed the search warrant affidavit. McKe-own investigated the address in four principal ways.

First, he ran the street address through a United States Postal Service (USPS) database. The result indicated to him that the address was a single-family residence.

Second, McKeown pulled a report showing the USPS-trackable parcels sent to that address between October 2020 and October 2021; none were addressed to a specific unit, just the street address.

Third, he consulted a general investigative database. This database also suggested to McKeown that the address was a single-family residence. It linked three residents to the ad-dress—Suggs not among them—all of whom shared a family name. None were listed on the database as living in a partic-ular unit number. McKeown also pulled driver's license rec-ords for two of the three, which did not list any unit numbers either. The database also showed the third resident was on supervised release. McKeown called that resident's probation officer, and though the officer said she had been to the ad-dress, McKeown did not confirm whether the address was a single-family residence.

Fourth, McKeown reviewed photographs of the address, taken by his investigation team, and concluded the photo-graphs showed a single-family residence because the address had one mail slot on the front door and no mailboxes outside.

A judge issued the anticipatory search warrant, along with a tracker warrant permitting agents to place a GPS tracker inside the parcel. With warrants in hand, agents replaced the pills in the parcel with a lookalike substance ("Smarties" candy) and dusted the parcel with a powder that turns purple when it touches human skin. Agents also put a GPS tracker inside the parcel, along with a device designed to alert them when the parcel was opened.

With a search team standing by, an officer dressed as a USPS worker delivered the parcel: she opened the address's exterior front door, rang two doorbells inside the door—a fact Suggs claims should have alerted agents to the likelihood there were multiple units in the building—and left the parcel between the exterior and interior doors. Two minutes later someone in the house retrieved the parcel. Nothing else happened until, about three hours after delivery, Suggs arrived and entered the front doors. Almost immediately after he entered, the parcel began moving, and several minutes later it was opened.

Once the parcel was opened, agents approached the address, knocked on the front door, and announced "police, search warrants" several times. With no answer, they entered the house, stepping first into a front vestibule area. There they encountered two people (neither Suggs) and observed two doors: one to the right and open, and another to the left and atop a flight of stairs. Agents secured the two people, entered the first door on the right—which opened into the first-floor unit—and conducted a protective sweep to determine whether other people were present on the first floor. While in the first-floor unit, agents heard footsteps from above. Still on the first floor, they proceeded toward the rear of the building

and found a door leading to a common stairwell connecting the first and second floors.

There, agents caught Suggs purple-handed, descending the rear stairwell holding a small plastic bag with his hands stained purple. They ordered Suggs to show his hands and stop; instead, he fled up the stairs into the second-floor unit, where he closed and locked the door. All told, agents encountered Suggs in the rear stairwell within two minutes of entering the building.

Agents forced their way into the second-floor unit, detained Suggs, and saw his clothes were stained purple, too. They swept the unit and found purple stains in a bathroom on a toilet seat and handle, the sink, and the floor. They also found white powder (which tested positive for a controlled substance), a garbage bag with the sham drugs inside it, and, in the rear stairwell, the GPS tracker.

By criminal complaint, McKeown alleged that Suggs attempted to knowingly and intentionally possess with intent to distribute a controlled substance in violation of 21 U.S.C. § 846. A grand jury indicted him on one count of this offense.

Invoking the Fourth Amendment, Suggs moved to suppress all evidence agents seized from his unit. First, he argued the anticipatory search warrant was invalid because it was too broad, as it described the address as single-family when it really had two units. Second, he claimed agents executed the warrant unreasonably by continuing their operation after they should have known the address had two units. Third, Suggs argued that neither the exigent circumstances nor inevitable discovery doctrines permitted agents to search his unit without a valid warrant.

The district court denied Suggs's motion. While it accepted that the investigation leading up to the signing of the warrant was "not robust," the district court nonetheless concluded that McKeown neither knew nor should have known that the address contained two units. After holding the warrant was valid, the district court also determined agents executed it reasonably because, even though agents should have known the warrant was too broad when they entered the front vestibule, they searched only Suggs's unit, the proper target of the warrant. And even had it invalided the warrant, the district court reasoned that agents were permitted to search Suggs's unit under the exigent circumstances and inevitable discovery doctrines.

Suggs then pled guilty but reserved the right to appeal the district court's suppression ruling. The district court sentenced Suggs to sixty-three months in prison and four years of supervised release. Suggs timely appealed.

## II. Discussion

"We review a district court's denial of a suppression motion under a dual standard of review: legal conclusions are reviewed de novo, while factual findings are reviewed for clear error." *United States v. Kelly*, 772 F.3d 1072, 1077 (7th Cir. 2014).

We proceed in three parts. First, we hold that the warrant, though overbroad, was valid. Second, we hold the warrant was executed reasonably. And third, we note that, even if the warrant were invalid, we need not reverse because agents lawfully entered Suggs's unit under the doctrine of exigent circumstances and lawfully seized evidence in plain view.

**A. The Warrant's Validity**

The Fourth Amendment to the U.S. Constitution requires that a warrant "particularly describ[e] the place to be searched[.]" U.S. CONST. amend. IV. This provision prevents "wide-ranging" searches by limiting government intrusion "to the specific areas and things for which there is probable cause." *Kelly*, 772 F.3d at 1081 (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)). "When a search involves a building with multiple, separate units, the warrant must specify the precise unit that is the subject of the search to satisfy the particularity requirement." *United States v. White*, 416 F.3d 634, 637–38 (7th Cir. 2005).

The parties agree the warrant incorrectly referred to Suggs's address as a single-family residence, when in fact the address contained two units: an upper unit (where Suggs lived) and a lower unit (where others lived). But this does not automatically invalidate the warrant. *Id.* (citing *Garrison*, 480 U.S. at 85). Rather, if when agents obtain a warrant they neither knew nor should have known that a building contained multiple units, we will uphold the warrant. *Id*. We determine what an officer knew or should have known objectively, based on the totality of the circumstances, considering only the information available to agents at the time the warrant was issued. "Just as the discovery of contraband cannot validate a warrant invalid when issued, so is it equally clear that the discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant." *Garrison*, 480 U.S. at 85.

Suggs argues McKeown acted unreasonably while investigating the address and should have known it contained two units. He bases this argument principally on McKeown's

failure to confirm with the probation officer whether the address was a single-family home. "McKeown ignored access to first-hand knowledge about the place to be searched[,]" Suggs says. He argues this failure "to obtain what appeared to be readily available information about the layout" of the address was unreasonable. Thus, he concludes, McKeown should have known the address was a single-family home, rendering the warrant invalid.

But we must analyze McKeown's conversation with the probation officer based on what McKeown knew then, not what we know now. *See Garrison*, 480 U.S at 85. When McKeown spoke to the probation officer, he had no reason to suspect the home was multi-unit. Rather, everything suggested the opposite, specifically: (1) none of his searches in governmental and public databases indicated the address had multiple units; (2) none of the driver records McKeown reviewed listed unit numbers; (3) the three residents listed shared the same last name, suggesting they lived together as a family; (4) every trackable parcel delivered to the address from October 2020 to October 2021—fifteen in all—were addressed without a unit number; and (5) the probation officer said nothing indicating that the address was a multi-unit dwelling. Nothing in McKeown's investigation made it unreasonable for him to conclude that he was looking at a single-family dwelling, and there were no "red flags" that made it unreasonable for McKeown to fail to confirm this with the probation officer.

## B.  The Warrant's Execution

Suggs alternatively argues that even if the warrant were valid, agents violated the Fourth Amendment by executing the warrant unreasonably. But this argument fails because

agents, after learning the address was multi-unit, searched only the proper target of the warrant: Suggs's unit.

The Fourth Amendment's general protection "against unreasonable searches and seizures" requires that a valid search warrant be executed in a reasonable manner. U.S. CONST. amend. IV; *Garrison*, 480 U.S. at 84. In the context of a multi-unit building, this means that agents, once they discover their warrant is too broad, must "limit their search to" the intended premises. *Garrison*, 480 U.S. at 86. If agents determine their warrant is too broad while searching the wrong unit, they must "discontinue" their search completely. *Id.* at 87. Agents may not conduct a roving search of all units in a building "until they f[i]nd the one they [are] looking for." *Jacobs v. City of Chicago*, 215 F.3d 758, 768 (7th Cir. 2000). Accordingly, we ask when agents discovered the warrant was too broad, and whether, after this discovery, they limited their search to the intended premises.

On the first question, Suggs argues agents should have known the warrant was too broad as soon as the officer who delivered the parcel saw two doorbells inside the security door. The record does not support that conclusion. Rather, as discussed above, all evidence before seeing the two doorbells suggested the address was single-family. With all other signs pointing to a single-family residence, two doorbells do not amount to much evidence of a multi-unit dwelling. Our conclusion might be different if, for example, the doorbells were labelled by unit number. But here, Suggs points to no such evidence.

Suggs cites *Jacobs v. City of Chicago*, where we concluded agents should have known their warrant was overbroad before they entered a multi-unit building, for his assertion that

the two doorbells alone should have alerted agents the address here was multi-unit. 215 F.3d at 769. But the fact that the building in *Jacobs* contained multiple units was much plainer than here. Each unit in the *Jacobs* building had its own entrance, number on the front door, and doorbell; and two of the units had their own gas meters. *Id.* at 763–64. And the building owner told agents there were multiple units in the building before the search, yet agents searched each unit one-by-one anyway. *Id.* None of the facts which made it plain in *Jacobs* that the targeted building was multi-unit are present here. Again: prior to the two doorbells, all evidence suggested the address was single-family.

We agree with the district court that agents should have known there were multiple units only when they entered the front vestibule and saw two more front doors—one immediately to the right, and one to the left up a flight of stairs—suggesting a distinct unit was behind each door. This prompts our next question: whether agents limited their search to the intended premises after they entered the front vestibule. We conclude on this record that agents properly limited their search once inside.

From the front vestibule, agents conducted a protective sweep of the first-floor unit and almost immediately confronted Suggs. Suggs does not challenge this sweep, which for the purposes of the Fourth Amendment is "a cursory inspection of those spaces where a person may be found[,]" not "a full search of the premises[.]" *Maryland v. Buie*, 494 U.S. 325, 335 (1990). After this sweep, agents entered the back stairwell, where they encountered a purple-stained man who, despite agents' commands, fled upstairs into his unit. This alerted agents that the upstairs unit was the true subject of the

warrant: the premises to which the parcel was to be delivered and ultimately opened. Agents then reasonably determined Suggs's apartment was the proper subject of the warrant before conducting a search pursuant to the warrant.

Suggs suggests that agents were required to stop their operation entirely (and seek a new warrant) upon learning the warrant was overbroad. But this finds no support in our precedent. In *United States v. Kelly*, officers obtained a warrant to search a defendant's "upper apartment" on the second floor of a two-story building, but realized while executing the warrant that the apartment was instead a "rear" unit spanning two floors. 772 F.3d at 1076. Even though officers continued their search after realizing this error, we held officers did not violate the Fourth Amendment because they limited their search to the proper target of the warrant (the defendant's unit). *Id.* at 1083. As we observed: "The *Garrison* Court nowhere suggested that if, after discovering the[ir] mistake[,] … a continued search of [the targeted] apartment would have been improper." *Id.* (citing *Garrison*, 480 U.S. at 86). So while agents must stop immediately if they determine they are actively searching the wrong unit, *Garrison* and *Kelly* confirm that they may still search the correct unit.

Perhaps if agents had searched the first-floor unit even after realizing the warrant was too broad, found contraband there, and criminally charged the first-floor residents, *those* residents might have a case to suppress evidence seized in their apartment. But that is not this case. Nor did agents conduct a roving search of other units to try and find the proper unit to search, which the Constitution forbids. *See Jacobs*, 215 F.3d at 769. Rather, agents entered the first-floor unit and swept the unit for other occupants. Here, we are satisfied

agents did not improperly search the first-floor unit in violation of the Fourth Amendment.

Because agents determined which unit was the proper subject of the warrant mere minutes after entering the front vestibule and searched only that unit, they executed the warrant reasonably.

### C. Exceptions to the Warrant Requirement

Even if we had concerns with the validity of the warrant or questioned the manner of its execution, Suggs's appeal would still fail. Agents entered Suggs's unit under circumstances that fall squarely within the doctrine of exigent circumstances and seized evidence in plain view.[1]

A warrantless search of a home is presumptively unreasonable. *United States v. Schmidt*, 700 F.3d 934, 937 (7th Cir. 2012). The government may rebut this presumption by showing an exception to the warrant requirement, like exigent circumstances, applies. *Id*. "Exigent circumstances, including the need to prevent the destruction of evidence, permit police officers to conduct an otherwise permissible search without first obtaining a warrant." *Kentucky v. King*, 563 U.S. 452, 455 (2011) (cleaned up). The burden is on the government to show law enforcement reasonably concluded exigent circumstances required they enter a home without a warrant. *United States v. Patino*, 830 F.2d 1413, 1415 (7th Cir. 1987).

When agents first encountered Suggs, they were in the back stairwell—a common space they could enter without a warrant. *See Harney v. City of Chicago*, 702 F.3d 916, 925 (7th

---

[1] The government also invokes the doctrine of inevitable discovery. Because we affirm on different grounds, we do not address this argument.

Cir. 2012); *United States v. Villegas*, 495 F.3d 761, 768–69 (7th Cir. 2007). They observed him descending the stairs with hands stained purple and holding a plastic bag, convincing evidence that he had opened the parcel containing the faux pills. He fled back into his unit after agents confronted him, strongly suggesting the parcel agents had delivered was inside the upstairs unit. Thus, agents reasonably feared that Suggs might destroy evidence: other controlled substances or the materials in the parcel agents delivered to Suggs's building. This fear justified entering his unit without a warrant. *King*, 563 U.S. at 462.

Of course, entering a unit based on exigent circumstances does not give agents carte blanche to search it. "Once a room is legally entered under exigent circumstances, a subsequent search or seizure of items in the room must be justified by a warrant or an exception to the warrant requirement." *United States v. Rivera*, 825 F.2d 152, 157 (7th Cir. 1987).

But the record is sufficient to suggest that agents saw the evidence at issue in plain view while sweeping the unit to secure it. The plain-view doctrine permits agents to seize evidence without a warrant if "(1) the officer is lawfully present at the place of the seizure, (2) the seized object is in the plain view of the officer, and (3) the incriminating nature of the object is immediately apparent." *United States v. McGill*, 8 F.4th 617, 622 (7th Cir. 2021). These factors are met here. After lawfully entering Suggs's unit under the doctrine of exigent circumstances, agents secured him and swept his unit to ensure no others were hiding there. In Suggs's unit, agents observed obviously incriminating evidence: Suggs's purple-stained hands and clothes; similar stains on a toilet seat and handle, a sink, and a floor (perhaps suggesting Suggs may have

attempted to destroy evidence); and white powder on the floor (which field tested positive for a controlled substance).

In sum, the doctrines of exigent circumstances and plain view would lead us to affirm even if we took issue with the warrant or its execution.

### III. Conclusion

For the reasons discussed above, we AFFIRM.